Good morning, Your Honors. May it please the Court, my name is Lisa Goodman. I'm here today with my co-counsel, Matthew Dietz, and we represent the appellant in the matter, Albert Schaw, a 31-year-old quadriplegic man who sought to obtain housing at Habitat for Humanity. We are here today for a de novo review. We would like a full and independent review of the District Court's grant of summary judgment for the appellee. Quoting the District Court, this is a novel issue to which the 11th Circuit has not spoken. Notwithstanding that, the District Court determined the law of this circuit by improperly relying on a 2008 decision in Schwartz v. City of Treasure Island, and the 2015 Phillip Pugh v. Apartment Investment and Management Company, and the 2nd Circuit decision in Salute v. Stratford Green Apartments, and decided that the law in this circuit does not require an accommodation based on a disabled person's financial condition when those accommodations would not have been made for a non-disabled person. That is not a proper analysis, whether an accommodation would be made for a non-disabled person. A reasonable accommodation standard requires four elements. Whether the person is disabled within the meaning of the Fair Housing Act, whether they requested a reasonable accommodation, whether the accommodation is necessary for the person to afford an opportunity for full and equal enjoyment of the dwelling, and whether the defendant denied that opportunity. That standard comes from this court's decision in Beguida v. Altamonte Height Condominium, a 2014 decision. This court stated the purpose of a reasonable accommodation in its decision in Holley v. Clareson Industry LLC. While that is an employment case, the court often looks at ADA and RA in order to determine Fair Housing Act cases. And the purpose of the Fair Housing Act is to treat people differently in order to allow them the opportunity to fulfill the functions of, in Holley would be employment, and in this case would be tenancy. The essential function of tenancy is the applicant's ability to pay rent. In this case, there's no dispute that Albert Shaw is able to pay rent. He was receiving $778 in Social Security disability income. His mortgage payment at Habitat was going to be $340 a month. Albert Shaw's Social Security disability income is a more secure source of income than actually working in the workforce. In the workforce, the applicant was only required to supply a verification of employment that employment was actually likely. Albert Shaw was going to supply a notarized statement that his father provided him $100 in addition in monthly support in order for him to meet the minimum income requirement that Habitat requires for tenancy. Can I ask you a question just about the last point? Are we still sure at this point in the proceedings that an annuity is not an option? Yes, Your Honor, an annuity is not an option. The same way that a trust would issue payments, that payment would be considered income, and that income would potentially disqualify him from other government assistance programs, including Medicare, which he relies on, and the government also, I believe, pays his... It slipped my mind, but there's other... It would disqualify him the same way as a trust would, and we supplied information about how a trust would disqualify him, and that also applies to an annuity. What efforts, if I'm allowed to ask this, I guess, about disclosing the client competencies, what efforts have been made that it seems like we are off-limits, and it seems like the financial support perhaps is there, maybe the annuity is not an option, is there some other vehicle? It just seems like an odd thing for this case to come down to an appeal in the 11th Circuit, where the parties seemingly are so close to being able to resolve it, and yet haven't been. Yes, Your Honor, we actually did participate in mediation. Unfortunately, the district court's ruling on the motion for summary judgment created a per se rule that this circuit states that the law in this circuit says that a financial accommodation or accommodation based on a person's financial condition is not permitted under the Fair Housing Act. That completely goes against this court's decision in a zoning case. Aren't they entitled to make a determination as to whether he can pay the mortgage payment? Yes, Your Honor, and in this case... They're in the banking business for that purpose. Absolutely, but his form of income, social security disability income, is more secure than... I understand that, but they think it is not quite enough. Right, so to satisfy them, actually Habitat initiated the idea of Albert Shaw providing a notarized statement. They're trying to help him. Correct, which basically means that Habitat conceded that an accommodation was necessary. They were trying to help him, but they weren't willing to accept the notarized note as being sufficient as a legal document. They wanted a trust or an annuity, and that would have disqualified him from government. The notarized note doesn't mean anything, nor the letter or whatever. It means more than a verification that employment is likely. The employer fills that out one day, and the employee can be fired the next. The verification of employment really means less than a notarized note from his father that he was receiving income. But Judge Choflat's point is that surely the lender in effect here, the benefactor, is entitled to make reasonable judgments to protect itself about ongoing financial support. If they've drawn the line between notary and annuity, that's not irrational, is it? It's not irrational, but in this case an annuity would affect him. It would compromise his government assistance. In this case, Habitat concedes that he needs an accommodation in order to meet the minimum income requirement, but it's a reasonable accommodation. The fact that they provided alternative accommodations is really more a reasonable analysis, not a necessary analysis. The court stopped after necessary because it decided that there is a per se rule that financial accommodations or accommodations based on financial conditions are not permitted under the Fair Housing Act. The district court created law in this circuit that this circuit has not spoken about, and there is a conflict between the circuits. The most persuasive case is Giebler v. M&B Associates. It's a Ninth Circuit case that involved a person with AIDS who was requesting an accommodation of an apartment complex's no-cosigner policy. He also collected Social Security disability income, and he did not meet the minimum income requirement, so he requested that his mother co-sign with him. The court in that case found that the imposition of burdensome policies, including financial policies, can interfere with disabled persons' right to use and enjoy their dwelling, thus necessitating an accommodation. That should be the most persuasive case that this court reviews, rather than the case that the district court relied on in Salute v. Stratford Green Apartments, which is a Second Circuit case that was actually decided before U.S. Airways v. Barnett, the Supreme Court case, which said that accommodations may need to result in preference for disabled individuals over non-disabled individuals, and that accommodations may adjust for practical impact, not only immediate manifestations. Mr. Shaw's inability to work is directly related to his disability. So let me ask you a question about that real quick. I guess one legal and one factual. The legal question is this. When we're trying to determine whether or not there is this sufficient causal connection between his disability and his inability, or let me say this, the disability and the inability to pay, are we looking at that on a plaintiff-by-plaintiff basis or sort of on a global basis? Because certainly it's not true that everyone who is disabled is unable to pay. Some people who are disabled are able to pay. Some people who are not disabled are unable to pay. So there's not a perfect correlation between those two groups. But maybe you say, no, no, no, you've got to look at it on a plaintiff-by-plaintiff basis, and I've demonstrated to you, court, that as to this fellow, his inability to pay is in fact inextricably intertwined with his disability. Which of the two analyses is appropriate, group or individual? Individual, Your Honor. As this court has previously stated, reasonable combination is done on a case-by-case basis. It's highly fact-intensive. So you would review each plaintiff on a plaintiff-by-plaintiff basis. The plaintiff in this case had an accident when he had just turned 20. It was a wrestling accident that left him quadriplegic. Prior to that, he was working in landscape and going to school to learn mechanic automotive to be in that industry. So if we're looking at it on a plaintiff-by-plaintiff basis, what evidence, I guess as opposed to arguing, but what evidence is there in the record to demonstrate his ability pre-accident to meet his obligations? Aside from the fact that he was working in landscape and was studying to be a mechanic. So because he was injured so young, his full potential of income was never actualized. So you can't look to the fact that, yes, he made this income prior to becoming disabled, so he would have met the minimum income standard then if he would have kept going in landscaping. So that's not a fair determination either. The fact remains that he did work prior to becoming a quadriplegic, and now he doesn't, and he relies solely on his Social Security disability income. But was there any quantitative evidence in the record at all about wages, whatever, that he would have been able to meet this condition but for the accident? I mean, because I guess just having a job wouldn't be enough, right? I mean, I'm not trying to sort of increase the burden too high, but surely there's got to be some quantitative evidence that but for the accident he could have met the minimum. I think the quantitative, and I think you mostly have to look at the fact that he was working, and now he's not working because if you focus too much on what he made prior to, it's not fair because he never got to actualize his full working potential. You know, you learn more, you go to school, you have promotions. Your income at one point is not your income forever. So it's not fair to just look at his income prior to becoming disabled as a factor to whether or not he's able to qualify for this minimum income standard now. You have to look at a case-by-case basis and look at the fact that he was working, he's not working because of his disability, and the fact that he's not working, he relies solely on his Social Security disability income, and that income is a secure source of income for him to pay the mortgage, which is an essential function of tenancy. And I just want to quickly, with my few seconds left, talk about the fact that the court also denied our disparate impact claim, and we believe that the Habitat's minimum income requirement affects people who collect $847.50 or less at a more harsh rate than other applicants. Thank you, and I want to just request that this court reverse remand to the district court. Thank you. Mr. McLean? May it please the court. My name is Robert McLean, and I represent Habitat for Humanity of Citrus County that I'll refer to as Habitat during argument today. Habitat sells houses to low-income families in Citrus County, Florida. These houses are secured by zero-interest mortgages. In order for an applicant to qualify for one of the zero-interest mortgages, there are several requirements, but there are two very important ones. One, the families must agree to provide 200 hours of sweat equity in helping build other Habitat client homes, but they also must meet the low-income housing guidelines set forth by the U.S. Department of Housing and Urban Development, otherwise known as the HUD guidelines. In 2015, which is the date that Mr. Shaw applied for Habitat's homeowner program, the minimum annual qualifying income for Citrus County, Florida, was $10,170 for a family of one. Now, Mr. Shaw's annual income in 2015 from SSDI, Social Security Disability, was $9,336, or $834 less than the required qualifying income under the HUD guidelines. Now, despite this, Habitat, through its employee, Rose Strawn, informed him that if his father, who they assumed was helping support him, if he agreed to provide an additional $100 in support, this might permit him to qualify. Ms. Strawn asked for, and Mr. Shaw's father agreed, Ms. Strawn supplies a notarized letter stating that he provided this support. However, Habitat's board of directors, which makes the final decision on applications to the homeowner program, stated that this notarized letter was insufficient guarantee of income. I guess I'll ask you the same question I asked your friend. Is there some happy resolution here? He says notary is good enough. You say no. You say annuity is required. She says can't do it. Is there some third option? I mean, this just seems ridiculous. Well, Judge, I wish I could talk to you about what was discussed during mediation, but of course I can't. I guess I'm just suggesting to you, it's hard for me to imagine, that we seem to be within a hair's breadth of resolving this thing and getting this young man into a house that you want to provide him. He wants the house. You want to provide him the house. And because we're dickering over the vehicle by which the additional income is delivered, we can't get it done. I completely agree with you, Your Honor. And part of the problem are government regulations. Well, the government, yeah, the effect of the financing vehicle upon Mr. Shaw's eligibility for government assistance. Now, it's important to note that in his complaint, he alleged that a trust or an annuity would make him ineligible for SSDI. After Habitat moved for summary judgment, the argument changed to, no, it doesn't make him ineligible for SSDI. It makes him ineligible for a Medicaid and the State of Florida's Medicare Assistance Payment Program. Let me ask you this. Do you agree that it renders him ineligible for the Medicaid benefit? The trust would. Well, there was evidence, at least, that the trust would make him ineligible based upon the conversation that the attorney stated in a declaration that she had where she said that a trust with mandatory payments could potentially make him ineligible for certain government benefits. There was absolutely no evidence presented to the court that an annuity would make Mr. Shaw ineligible for government benefits. The argument was made by analogy by Mr. Shaw's attorney in response to our motion for summary judgment. The district court correctly stated in its order that there was no evidence that an annuity would adversely affect the eligibility for government benefits. Habitat, even though we believe that under the law, it wasn't required to do so, attempted to accommodate Mr. Shaw's financial condition by stating we will accept the $100 in family support but only if it is guaranteed by a trust or an annuity. Mr. Shaw said no, you've got to take the trust or you've got to take the notarized letter. Habitat said no, and this lawsuit ensued. No one here disputes that Mr. Shaw is disabled and therefore protected under the Fair Housing Act. In addition, no one disputes that the Fair Housing Act would require Habitat to provide Mr. Shaw a reasonable accommodation to permit him to enjoy Habitat housing. In fact, Habitat routinely provides accommodations to its disabled clients. For example, it often permits family members or friends to provide some of the sweat equity hours that they are physically unable to do based on their disability. However, as the district court pointed out, Habitat was not required to consider Mr. Shaw's proffered accommodation, except a letter from his father as proof of income, because this was not a request to accommodate his disability. It was a request to accommodate his financial condition. Let me ask you this. I mean, isn't it a little too simplistic? I was sort of exploring the correlation between disability and financial ability with your opposing counsel. I mean, isn't it a little too simplistic to say, no, no, no, this is just about financial ability to pay and it has nothing to do with disability. Can you deny that there is some correlation between the two? Don't deny that there might be. And even the Salute Court, which the second circuit court, which the district court partially relied upon in its decision, even the Salute Court stated that while there might be a relationship between the disability and the adverse financial condition, that's not what the Fair Housing Act was designed to do. The Fair Housing Act was designed to accommodate a person's disabilities, not their economic condition that might be as a result of the disability. And that's what the second circuit said, and in its decision that's what the district court said. However, we believe, and I argued this in Habitat's brief, that even if you apply the ninth circuit's decision to the facts of this case, then Habitat would still be entitled to summary judgment because there was no evidence presented as to Mr. Shaw's ability to actually pay the mortgage. Mr. Shaw's work history was limited. He was, through a tragic accident, disabled at age 20. He worked in landscaping. No evidence was presented that he had a sufficient income through his work that would have allowed him to meet the mortgage before he was disabled. And that's different from the Giebler case, where the Giebler decision specifically referenced evidence in the record that Mr. Giebler, prior to being diagnosed with AIDS, made sufficient income as a psychiatric technician to meet the income requirements of the apartment complex where he was attempting to get a lease. Not necessarily an expert, no. But if there were pay stubs compared to what the HUD guidelines were at the time that he was working, for example, if the HUD guidelines stated that he had to have an income at the time that he became disabled of $900 a month, for example, and his pay stub showed that, then that might be sufficient evidence under the Giebler standard in order for him to demonstrate that his accommodation was related to his disability. But under the standard that the district court found applied here, that relationship is not relevant because the request for an accommodation was to accommodate his economic condition, not his disability, which is what both the district court and the salute court in the Second Circuit stated was the test that you had to meet. So your position, I guess, again, back in reference to a question I asked your adversary, is number one, as a matter of law, you test the causation proposition, the causal connection between disability and inability to pay, not on an individual basis, but instead on sort of a class-wide basis. And you said because some disabled people can pay and some able people can't pay, there's no necessary correlation between the two. But even if you go to the Ninth Circuit standard, if you will, and assess it on a plaintiff-by-plaintiff basis, then there's just no evidence here. That is correct. That was our alternative argument, that even if you apply the Ninth Circuit standard, that there's no evidence in this case that there's a causal relationship between the low economic condition, which is the financial disability, and Mr. Shaw's clear physical disability. As to the former, the legal proposition, what do you have to say to her argument that sort of why would you assess it on sort of a global basis? Why would you assess the causal connection on a global basis? Why don't you look at this particular plaintiff and determine whether or not his inability to pay is caused by his disability? Because as the Salute Court stated, the Fair Housing Act is there to place Mr. Shaw and other people in his position in the same position as a disabled person or a non-disabled person with the same economic status. Because there could very well be a person who's not disabled but who is working but does not have sufficient income to meet Habitat's income qualification standards. So what the Fair Housing Act is meant to do is to even the playing field. And if you start looking at the economic condition of the disabled person, you're actually giving them a heads up over a non-disabled person in the same economic condition. To go forward, the court, as I said, it relied upon to a certain extent the Salute decision. But it also relied upon the Eleventh Circuit's own Swartz decision. In that case, Swartz stated that the court requires only those accommodations that are necessary to afford the disabled person an equal opportunity to use and enjoy the dwelling. If a requested accommodation goes beyond addressing the needs created by the handicap, then the disabled person is not given that equal opportunity but a preference over the non-disabled person that is not permitted by the Fair Housing Act. In other words, as stated by the Second Circuit in Salute, it is fundamental that the law addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps. And that, to a certain extent, addresses the questions that you were asking me, Judge Newsom. So based upon the law of this circuit, as announced by Swartz  the district court properly found that the Fair Housing Act did not require Habitat to accommodate Mr. Shaw's financial conditions, even though they attempted to do so. To do otherwise would have put him in a preferential condition over a non-disabled person with the same income. Now, to briefly address the disparate impact claim, Mr. Shaw alleged as follows on his disparate income count of his complaint. By setting the minimum gross income requirement for a single family house at $10,170, Habitat excludes any applicant receiving SSDI, which includes Shaw. Now, in response to this allegation, Habitat presented evidence in conjunction with its motion for summary judgment that at least eight of its successful applicants within the past couple of years have received SSDI as their income, yet they qualified. In response, the plaintiff's tactic somewhat changed, and they stated that the effect of that income requirement was to state that any person with a disability making less than $845 a month in SSDI would not qualify. But the court found that there was no evidence presented, even if you accept that that's an argument that can be made, that there was a quantitative disadvantage given to disabled people in Citrus County who would have applied for the Habitat program in opposition to non-disabled people. So with that, I will end my argument, and thank you, Your Honors. Ms. Goodman? Just a few points, Your Honors. The purpose of the Fair Housing Act is to integrate disabled persons into the community and to increase the extent disabled persons enjoy living independently. I think that this is most similar to zoning cases, in which the Seventh Circuit in Ocotano Walk stated that community-based residential facilities provide the only means by which disabled persons can live in residential neighborhoods because of financial reasons. Considering a person's financial condition is important because, in this case, it is directly related to his disability. He's unable to work because he is disabled, and because of that, he collects Social Security disability, which is his sole source of income. I hate to knock you off your slide in your rebuttal, but can I ask you again why it is that you insist that an annuity will not come out, not of SSI, but of the Medicaid possibility? Because Habitat was requiring mandatory payments to Mr. Shaw. They were requiring, I believe it was a $5,000 annuity that was going to issue mandatory payments. Those mandatory payments are considered income, and any additional income could disqualify Mr. Shaw from his government assistance. So the same way that a trust would have issued payments, the annuity was going to issue payments, it's the same concept. So that's why he couldn't do an annuity. Basically, his only option was to do a notarized note or for Habitat to consider the $194 that he receives in food stamps as income, which would have also allowed him to meet the minimum income requirement. Essentially, Albert Shaw requested two accommodations, either the notarized note or for Habitat to consider food stamps as income in order for him to meet the minimum income requirement. The thing that concerns me here, and I've been thinking about this, I guess, it won't surprise you, is that I worry that both of you are litigating potentially issues that range beyond the four corners of this case, that we've lost sight of this case. It is hard for me to imagine that there is not a happy resolution here, that there is not some third option between notarization perhaps and an annuity that would allow your client into this house. They want to give it to him, you want in. It is inconceivable to me that there is not some path to resolution. I agree, Your Honor. I think there is a couple other— You agree and he agrees. Everybody agrees that there might be some third option, that there might be some happy resolution. Well, it would be a happy resolution if it was a path that wouldn't disqualify Mr. Shaw from his government assistance. I think that's the most important thing. And I think it's also telling—it's clear that he does need an accommodation, and accommodation is necessary, even though the district court found that it wasn't. And Habitat could have considered $194 that Shaw receives in food stamps, or Habitat could have looked at his net income rather than his gross income, where his net income is the same as his gross income. I'll just speak for myself. Before either of you risks an 11th Circuit decision that you may or may not like, I would be inclined to get involved in a decision that you don't like. Right now what you have, you have a district court decision that you don't like. He likes it. He probably can't do much with it, frankly. But I can see the case going either way here. And that would be a decision, an adverse decision, that either of you would have to live with nationally, in effect, because you would try to extort this one the way that you have the 2nd and the 9th Circuit's decision. And before you risk that, I would give mediation another chance. I'm only speaking for myself. I have no idea what my colleagues think. This is a case, though, that for me screams out this decision. Sorry to interrupt. We have your case. We understand the controversy. Thank you, Your Honor. Thank you, Your Honor. We'll go to the next case.  Mr. Gordillo.